UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| In re: Daniel Isfan <br>                 Debtor | Bankruptcy Case No. 04 B 73288 <br><br> Chapter 7 |
| Linda Ostlund, <br>                 Plaintiff <br> v. <br> Daniel Isfan, <br>                 Defendant | Adversary No. 04 A 7113 |

## MEMORANDUM OPINION FINDING THE DEBT IS EXCEPTED FROM DISCHARGE PURSUANT TO 11 U.S.C. § 523(a)(2)(A)

This matter is before the Court on the one count adversary complaint brought pursuant to 11 U.S.C. § 523(a)(2)(A). Linda Ostlund, the plaintiff ("Ostlund") is represented by Attorney David Pauker of Pauker & Rubin, Ltd. Daniel Isfan ("Isfan"), the defendant, is represented by Attorney Scott A. Bentley. An evidentiary hearing was held in this matter, and the parties submitted post-trial proposed findings of fact and conclusions of law. For the reasons set forth below, this Court finds that the debt is excepted from discharge.

### JURISDICTION

This Court has jurisdiction to decide this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

## OBJECTION TO THE INTRODUCTION OF EXHIBIT N

As a preliminary matter, this Court must rule on Ostlund's objection to the introduction of Isfan's exhibit N. The pretrial objection was based upon Isfan's failure to comply with the trial order that required the parties to exchange exhibits ten days prior to the trial date. Isfan's counsel sent a package of 97 unmarked pages by express mail. The documents purported to consist of receipts of Isfan's expenditures on the project. Attorney Pauker received those documents less than seven days prior to the trial date. He then filed an objection to them based upon the failure to comply with the trial order. Attorney Bentley marked, scanned and electronically filed the documents the evening before the trial date.

At the onset of the hearing, Attorney Pauker raised his objection to the exhibits. This Court reserved ruling on those items until such time as they would be moved for admission. The only documents tendered for admission was a two page table prepared by Isfan. The table lists description of work, the vendor and cost. The Court sustains the objection to exhibit N for two reasons. First, the exhibit was not submitted in accordance with the trial order entered. Second, the exhibit consists of a summary of alleged expenditures on the project. Many of those items are not dated and no receipts were tendered in support of those expenditures. Therefore, the objection is sustained and the exhibit is not admitted into evidence.

## FACTS

Linda Ostlund had lived in the home located at 6505 West Forest Preserve Drive

in Harwood Heights, Illinois since childhood and became the owner when her parents passed away. (Tr. at 7-8.) Ostlund is a manager at the Annex Center as a therapeutic recreational therapist. She has a bachelor's degree and a master's degree in therapeutic recreation. (Tr. at 6.) In August of 2001, Linda Ostlund was referred to the debtor, Daniel Isfan, of DCH Construction to remodel her home. Isfan informed Ostlund that DCH Construction had been in existence since 1984 and that he had recently become the president. (Tr. at 7.) Isfan estimated the remodeling would cost between $80,000- $90,000. (Tr. at 8.)

Five months later in January of 2002, Ostlund contacted Isfan after she had determined from the Better Business Bureau that the business was classified as satisfactory. Isfan again visited her home and estimated the remodeling would cost $90,000. (Tr. at 9.) The remodeling was to include a new foundation and a complete remodel of the first and second floor, including electricity, plumbing and roof. (Tr. at 9-10.) Isfan and Ostlund entered into a contract on January 15, 2002. The contract called for a total cost of $90,000, with "10 percent down 40 percent on start another $22,500 (25%) after framing is up and a finial (sic) payment at finish." The proposal attached to the exhibit indicates that Isfan was to "fix front foundation (If damage is greater then [sic] contract calls for owner will pay extra.)" (Pl. Ex. 2.)

Once the contract was signed, Isfan made it very clear to Ostlund that "from now on it would be only verbal agreements." When questioned about Isfan's reason for verbal agreements, Ostlund replied that she and Isfan had engaged in a conversation about their personal faith, including Isfan's disclosure that his father had been a Romanian pastor and that he was a believer and attended a church in Crystal Lake. (Tr.

3

at 10-11.) After Ostlund signed the contract, Isfan visited her home on four separate occasions during the evening and requested the down payment. (Tr. at 11.) Ostlund tendered Isfan a check for the $9,000 down payment made payable to DCH Construction on February 4, 2002. (Tr. at 12.)

Ostlund was required to move out of the home due to the nature of the work on the foundation. Isfan was "very admant and wanting to help (her) to move and he said it was the only thing he could do as brothers and sisters in Christ." (Tr. at 13.) Isfan brought three men and his truck on February 22, 2002, to move Ostlund into the YMCA. In addition to Ostlund's furniture and personal belongings, a furnace purchased in November of 2001 and a fence were removed from the property. (Tr. at 14-15.) Isfan indicated he would store the furnace and the fence until the time they could be installed on the property. (Tr. at 15.)

Three days after the move, on February 25, 2002, Ostlund met Isfan at the property. Although Isfan never applied for a permit to remodel the home (Tr. at 187), Isfan told Ostlund that the inspector for the Village of Harwood Heights informed him that the home could not be remodeled, but instead needed to be demolished. (Tr. at 17.) The proposal and contract were amended on February 25, 2002, to build a new home plus a one-and-a-half car garage for a total cost of $106,000 plus $15,000 for additional square footage. It also indicated that the $9,000 down payment and the $15,000 for the additional square footage were paid and that the 45 percent payment increased from $36,000 to $45,500. (Pl. Ex. 2.) Isfan told Ostlund he needed $45,000 to start the project and continue on. Ostlund tendered Isfan a check made payable to DCH Construction in the amount of $45,000.

4

On March 1, 2002, Ostlund again met Isfan at the property and met Lawrence Golds, an architect selected by Isfan. When Mr. Golds asked who he should be making contact with, Isfan indicated himself. (Tr. at 18-19.) Ostlund did not question this procedure because she had never had an experience with home building, and she trusted Isfan. (Tr. at 19.) On March 15, 2002, Isfan introduced Ostlund to Randall Toems ("Toems"). Isfan informed her that his business was going so well he was able to hire Toems as his sales representative. (Tr. at 19-20.) In fact, however, Isfan underbid the project and hired Toems to talk Ostlund into upgrading the project. He testified he recalculated the numbers which came in higher and he never spoke to her. That's when he sent Toems to go speak to her. (Tr. at 184.) At that meeting, Toems utilized a laptop computer to show Ostlund a three-dimensional sketch of plans for her home. She tendered a check to Isfan that day in the amount of $15,000 made payable to DCH Construction. (Tr. at 21.) Toems and Ostlund arranged to meet at a DCH Construction office to select carpet, door fixtures, windows, and woodwork. Ostlund took five catalogs home with her and later informed Toems of her selections. (Tr. at 22.)

Ostlund repeatedly attempted to call Isfan after that meeting, but heard nothing until the end of April. Isfan called her and apologized for not being in contact with her and explained that he had been on a project in Deerfield, Illinois. (Tr. at 23.) Isfan also indicated that the village required him to have pest control and that he was working things out with the village. (Tr. at 24.) In May, Ostlund began telephoning Isfan twice per day. (Tr. at 24.) Isfan eventually telephoned her around the end of May, apologized again and assured her the home would be completed by the end of August. (Tr. at 25.)

By the end of June the home had finally been demolished. (Tr. at 26.)

On July 1, 2002, Isfan visited Ostlund at her place of employment unannounced and requested additional monies for the project. (Tr. at 25.) He indicated things were moving quickly and he needed to put in drainage and purchase lumber in order to continue the project. He indicated he needed $11,290 for the foundation. Ostlund gave Isfan a check made payable to Daniel Isfan in the amount of $11,290 with the notation "foundation" in the memo portion. (Tr. at 26.) One week later on July 8th, Toems visited Ostlund at her place of employment. Toems, on behalf of Isfan, requested reimbursement for material and lumber. Ostlund was shown a receipt from Crafty Beaver Lumber Yard and spoke to Isfan on Toems' cellular telephone. Ostlund issued a check payable to Randall Toems in the amount of $13,500 with "garage" noted in the memo portion. (Tr. at 29.) Subsequently, Ostlund was informed by the manager at Crafty Beaver that the document she was presented with was neither an invoice nor a receipt, but was instead just an estimate. (Tr. at 28.)

Four days later, on July 12, 2002, both Isfan and Toems again visited Ostlund at her place of employment unannounced and requested money for "drainage." (Tr. at 28-29.) On that date, Ostlund executed a check payable to herself in the amount of $8,000 with "DCH Construction" noted in the memo portion. Because Isfan told Ostlund that he was having problems with his bank account and needed cash, Isfan escorted her to the bank, and she tendered him the cash. She received a written note as a form of receipt. (Tr. at 30.) One week later on July 19, 2002, Isfan and Toems again visited her at her place of employment and requested money for plumbing. Ostlund asked Isfan what was going on with her money, and he told her that the materials were being

6

stored at Home Depot. Ostlund believed him. (Tr. at 31.) Thus, Ostlund again endorsed the check to herself and tendered $11,200 in cash to Isfan so that he could start the project immediately. (Tr. at 32.) At that time, no work had been completed except the demolition of the home; the property consisted of a hole in the ground and debris. (Tr. at 33.)

On July 25, 2002, Toems visited Ostlund at her place of employment and telephoned Isfan. Ostlund spoke to Isfan who told her they needed money for carpeting and tile in the amount of $10,000. Ostlund again executed a check payable to herself, cashed it and gave the cash to Toems. Isfan told Ostlund that the project would be completed by the end of August. (Tr. at 34.) Four days later on July 29th, Isfan and Toems visited Ostlund, unannounced, at her place of employment. This time, however, Isfan requested a personal loan in the amount of $4,500. He told Ostlund it was to renew his construction license and promised to either pay back the loan or put the money into her home. (Tr. at 34.) Yet again, Ostlund executed a check made payable to herself and noted "DCH Construction" in the memo portion, negotiated it and tendered the cash to Isfan. (Tr. at 34-35.)

Shortly thereafter on August 5th, Toems and Isfan visited Ostlund at her place of employment, unaccounced. Isfan requested an additional loan because he was "hard pressed for cash." (Tr. at 36.) Again, he profusely promised to pay the two loans back and/or put the money into her home. (Tr. at 36.) Still, no work had been performed on the home. Ostlund endorsed the check made payable to "cash" in the amount of $5,000 noted "DCH Construction" in the memo portion and gave it to Isfan. Before giving Isfan the check, she asked what had happened with all the money she had given him

because she had seen no progress on the property. (Tr. at 37.) Isfan informed her that the money was in escrow and was assured and protected there. (Tr. at 37-38.) Isfan testified that his "escrow account" consisted of a checking account at Bank One from which he would deposit and withdraw funds. (Tr. at 111.)

Some time in the middle of August, Toems visited Ostlund at her place of employment and told her Isfan had returned to Romania on an emergency and requested $6,000. Ostlund refused to give him any more money. (Tr. at 39-40.) Toems then suggested terms of an agreement. On August 30, 2002, Isfan, as owner of DCH Construction, and Ostlund entered into a written loan agreement. (Pl. Ex. 4.) Simultaneously, Isfan tendered Ostlund a check in the amount of $4,750 for repayment of the loans. That check was later returned NSF. (Tr. at 38-39.) After the check was returned NSF and Ostlund determined that the Crafty Beaver receipt was not in fact a receipt, she filed a complaint with the police department. Detective Devries from the Harwood Heights police department requested an interview with Ostlund. (Tr. at 41.)

Ostlund obtained a file from the Village of Harwood Heights concerning permits or alleged violations. (Tr. at 43.) The building department file indicates a permit to demolish the house was issued on March 12, 2002 with a start date of March 26 and end date of April 26. (Pl. Ex. 7 at Q.) There is no date on the application, but a written notation indicates "paid" in the amount of $560. (Pl. Ex. 7 at P.) A service report from ABC Pest control is dated April 27, 2002 and indicates a $150 charge and that no evidence of infestation was found. (Pl. Ex. 7 at R.) The Application for Business License covers the fiscal year of May 1, 2002 to April 30, 2003. (Pl. Ex. 7 at L.) Proof of liability insurance is dated June 22, 2002. (Pl. Ex. 7 at N.) The license and permit

bond were executed on June 24, 2002. (Pl. Ex. 7 at O.) A Building permit was issued on September 12th at a cost of $870. In addition, on September 9th or 10th various permits and bonds were approved and receipts dated September 18, 2002 totaling $5,810 are attached. (Pl. Ex. 7 at S-Y.)

The Village inspector's notes indicate various stages of work. A note dated July 3, 2002 indicates demolition was "in progress - being loaded into dumpster." (Pl. Ex. 7 at A.) On October 8, 2002, the inspector approved the footing inspection for the building only, not the garage. (Pl. Ex. 7 at D.) On October 16, 2002, the inspector was to inspect the footing on the garage. The report indicates the framing on the garage was allowed to continue, as long as additional concrete was poured and connected to the exiting footing to be completed by October 21, 2002, or the permit would be revoked. (Pl. Ex. 7 at F.) Subsequently on October 21, 2002, the inspector did not approve the footing and noted: "do not pour until rebarr is installed and inspection made." (Pl. Ex. 7 at G.) Ostlund testified that the Village of Harwood Heights also received NSF checks from Isfan. As a result, the village put a halt on the project. (Tr. at 46, 68.)

Ostlund borrowed $90,000 to fund the remodeling. She had to begin making payments on that loan in February of 2002. She ultimately sold the property because she could not afford to rebuild and make the loan payments. (Tr. at 47-48.) Ostlund never received proof of the purchase of any materials. (Tr. at 47.) Ultimately, Isfan and Toems were criminally charged. Isfan plead guilty to misdemeanor theft. (Tr. at 43; Pl. Ex. 13.) Ostlund received $13,500 from Isfan as restitution. (Tr. at 46-47.) Isfan introduced the photcopy of a check dated January 9, 2003 made payable to her from

9

Iosif Isfan, Isfan's father. (D. Ex. 1.) Ostlund denies receipt of those funds. (Tr. at 63, 75.) There is no indication that the check was negotiated. A judgment was entered on April 29, 2004, in favor of Ostlund in civil court in Cook County in the amount of $141,112. (Pl. Ex. 1.)

## DISCUSSION

The party seeking to establish an exception to the discharge of a debt bears the burden of proof. *Selfreliance Fed. Credit Union v. Harasymiw (In re Harasymiw)*, 895 F.2d 1170 (7th Cir. 1990). The burden of proof required is a preponderance of the evidence. *Grogan v. Garner*, 498 US 279 (1996). To further the policy of providing a debtor a fresh start in bankruptcy, exceptions to discharge are to be construed strictly against a creditor and liberally in favor of a debtor. *In re Scarlata*, 979 F.2d 521 (7th Cir. 1992).

Section 523(a)(2)(A) lists three separate grounds for dischargeability: actual fraud, false pretenses, and false representation. In order to except a debt obtained by false pretenses or a false representation from discharge, the plaintiff must establish the following elements: 1) the defendant obtained funds through representations that the plaintiff either knew to be false or made with such reckless disregard for the truth as to constitute willful misrepresentations; 2) the defendant possessed the requisite scienter, i.e. he actually intended to deceive the plaintiff; and 3) the plaintiff justifiably relied on the misrepresentation to his detriment. *Jairath* 259 B.R. 308, 314 (Bankr. N.D. Ill. 2001); *see also Field v. Mans*, 516 U.S. 59, 74-75 (1995). The difference between justifiable

10

reliance and reasonable reliance was explained by the Supreme Court in *Field v. Mans*, 516 U.S. 59, 71 (1995):

> Although the plaintiff's reliance on the misrepresentation must be justifiable . . . this does not mean that his conduct must conform to the standard of the reasonable man. Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases.

(Citation and Internal quotations omitted.)(Alteration in original.) The Supreme Court went on to explain that "justifiability is not without some limits, however." *Id.*

> "[J}ustificable reliance is the standard applicable to a victims conduct in cases of alleged misrepresentation and that "[i]t is only where, under the circumstances, the facts should be apparent to one of his knowledge and intelligence froma cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own.

*Id.* (quoting W. Prosser, Law of Torts § 108 p. 718 (4th ed. 1971)).

According to the Seventh Circuit in *McLellan v. Cantrell*, 217 F.3d 890 (7th Cir.2000), a different analysis may be used when a plaintiff alleges actual fraud. The plaintiff must allege: 1) a fraud occurred; 2) the debtor was guilty of intent to defraud; and 3) the fraud created the debt that is the subject of the discharge dispute. *Id.* A deceitful trick may constitute "actual fraud." Thus, either misrepresentations or some trick and deceit can amount to actual fraud. *Mukhi*, 254 BR 722, 728-29 (Bankr. N.D. Ill. 2000).

While many construction projects are never completed, the debt they result in is only excepted from discharge when it falls within one of the exceptions to discharge. Here, Ostlund alleges that the debt owed by Isfan was obtained by false

representations, false pretenses and/or actual fraud. Isfan admits he accepted either a check or cash directly from Ostlund on the following eight separate occasions:

| | |
|---|---|
| 2/4/2002 | $9,000 check payable to DCH Construction |
| 2/25/2002 | $45,000 check payable to DCH Construction |
| 3/15/2002 | $15,000 check payable to DCH Construction |
| 7/1/2002 | $11,290 check payable to Daniel Isfan, "foundation" memo |
| 7/19/2002 | $11,200 cash |
| 7/25/2002 | $10,000 cash |
| 7/29/2002 | $4,500 cash loan, "DCH Construction" memo |
| 8/5/2002 | $5,000 cash loan, "DCH Construction" memo |

Isfan disputes receipt of the $13,500 check payable to Randall Toems dated July 8, 2002, with "garage" noted in the memo portion and the $8,000 cash tendered on July 12, 2002 (for drainage). However, Isfan admitted he requested those funds from Ostlund but denied receipt of them. He did however, state that those funds went into the project. The mandate to strictly construe exceptions to discharge in favor of the debtor would, without more, tip the scales in favor of Isfan. Even assuming that the representations as to the use of the needed funds were true, additional representations tip the scales in favor of Ostlund.

Initially, the project called for remodeling the home. It also required Ostlund to vacate the premises. Isfan all too eagerly assisted her to vacate the premises. After she no longer resided at the property, Isfan convinced Ostlund of the necessity to demolish the home, and the parties modified the contract. About two weeks later, Isfan introduced Ostlund to Toems who he had hired to talk Ostlund into upgrading the project because he had underbid it from the beginning. The representation that her home required demolition can only be viewed as a misrepresentation. Isfan had never even applied for a permit to remodel the home.

12

From July 8 through July 25, Ostlund tendered a total of $31,500 to Isfan. Isfan represented these funds were for materials to build the garage, for plumbing, carpeting and tile. However, the building permits were not issued until September 18, well after July. While there was some garage work completed, no carpeting and tile were ever installed or returned to Ostlund. Again, these statements are found to constitute misrepresentations by Isfan.

Subsequently, after Isfan received more than $80,000, Ostlund asked Isfan what had happened with the funds she had tendered to him already. Isfan responded that the materials were being stored at Home Depot. Similarly, about two weeks later when Isfan requested the second loan, she asked him what had happened to the money she had given him because she had seen no progress on the property. Isfan told Ostlund that the money was in an escrow and was "assured and protected there." (Tr. at 37-38.) Isfan testified his "escrow" account consisted of his checking account. (Tr. at 111.) This Court cannot believe that Isfan was not aware of what constitutes an escrow account. He had been in the construction business for 17 years and was president of a construction company. This Court finds that the these two responses constitute misrepresentations by Isfan.

This Court finds the credibility of Mr. Isfan questionable, at best. In addition to making contradictory statements, Isfan's assertions are nonsensical. For example, despite the fact that Toems extorted money from and was terminated by Isfan, Isfan gave Toems a certified check to tender to some third party to then tender to Ostlund as repayment of the loans. Isfan claims his father gave him the $9,000 check to give to Toems who in turn was to turn it over to Toems' attorney to tender to Ostlund. (Tr. at

113.) Subsequently, Isfan testified that he gave the check to Toems to give to the detective to give to Ostlund. (Tr. at 139, 180.) He claims he was on the telephone with the detective when Toems told the detective "I'm going to come over and give you the money." (Tr. at 139.) He also claims he telephoned the detective and obtained a copy of the check from him. (Tr. at 140.)  The testimony as to the certified check constitutes yet another incredible inconsistency told by Isfan.

The Court finds that Isfan's statements constitute misrepresentations and his actions indicate his intent to defraud Ostlund. The funds tendered to Isfan as loans, which were subsequently evidenced by a loan agreement, cannot be said to be obtained by fraud. Ostlund was aware those funds were not to be utilized for her home. Although the truth of whether a construction license needed to be renewed is unknown, it is inconsequential in light of the fact that Ostlund advanced funds a second time based upon Isfan's desperate need for money.  No misrepresentation was made aside from the promise to repay. The promise to repay a loan does not constitute a misrepresentation. Therefore, $9,500 was not obtained through the use of false representations.

The remaining question as to the remaining debt is whether Ostlund's reliance on the misrepresentations was justifiable. Ostlund was a homeowner of her childhood home as a result of the death of her parents. Therefore, she had never even purchased a home, let alone remodeled one. Ostlund believed Isfan was a religious man, which was very important to her. After a few checks were tendered, Ostlund did inquire as to the use of those funds. She was told the building materials were being stored at Home Depot. Her second indication of concern was soothed with the

assurance that her funds were in an escrow account and were protected there. Ostlund was inexperienced, and Isfan was the president of a construction company which had been in existence for about fifteen years. This Court finds that Ostlund's reliance on the representations of Isfan was justifiable based upon the qualities and characteristics of Ostlund.

As additional grounds, this Court finds that even in the absence of any misrepresentations, Isfan committed some "trick or deceit" upon Ostlund. Isfan knew he had problems with the project from the beginning. He then moved Ostlund out of her home, told her it had to be demolished, then hired Toems to convince her to upgrade the project. He knew Toems was frequently getting cash from Ostlund. (Tr. at 136.) Isfan was playing a dangerous game that eventually caught up to him. He admitted to diverting funds from other projects to put into the Ostlund project. From the day they signed the contract, Isfan represented he was a Christian who attended church. He insisted as "brothers and sisters in Christ" that he would help her move out of the home. Isfan took advantage of Ostlund's trust and inexperience. This Court finds that his actions fall within the "some trickery or deceit" as described by the Seventh Circuit in *McClellan*.

## CONCLUSION

This Court finds that all elements of fraudulent misrepresentation have been satisfied, except as to the funds loaned and the restitution received. Isfan made statements that were false in order to obtain the funds; he intended to deceive Ostlund and she justifiably relied on those statements to her detriment. Therefore, the debt,

minus the $9,500 loan and $13,500 paid as restitution, is excepted from discharge in the total amount of $94,505.

The foregoing constitutes findings of fact and conclusions of law as required by Fed. R. Civ. P. 52(a) and Fed. R. Bankr. P. 7052. A separate judgment will be entered giving effect to the determinations reached herein.

Signed: February 22, 2006

MANUEL BARBOSA
United States Bankruptcy Judge

## CERTIFICATE OF MAILING

The undersigned hereby certifies that the attached memorandum opinion and orders have been served via First Class Mail on February 22, 2006 to:

Atty. Scott A. Bentley
3425 West Elm Street
McHenry, Illinois 60050

Atty. David H. Pauker
Pauker & Rubin, LTD.
180 N. LaSalle Street, Suite 1601
Chicago, IL 60601

Lisa Gorman Perez
Judicial Law Clerk